Good afternoon ladies and gentlemen. The court will now hear argument in a case that we have specially set. The San Luis & Delta-Mendota Water Authority and the California Department of Water Resources v. Penny Pritzker. There are multiple numbers but the lead number is 12-15144. It's my understanding that counsel has allocated amongst your group, who's going to go first. I understand Mr. Sloan, you're going to lead off, is that right? Oh, you're appellees and cross-appellants. Okay, so Ms. Durkee, are you going first? Who's going first? All right, batter up. May it please the court and good afternoon. I am Ellen Durkee appearing on behalf of the federal defendants. I will be sharing my time with Ms. Poole for the case and we're going to, our goal is to reserve seven minutes for rebuttal. Federal and intervener defendants appeal from a district court judgment in validating the salmon and biological opinion that addresses long-term operations of the Central Valley and state water projects. This court should reverse the district court and uphold the salmon and biological opinion. This court recently reversed the same district court's invalidation of the related Delta smelt biological opinion. Obviously, the present case should be approached through the lens of the Delta smelt decision. The Delta smelt decision recognized the complexities and the importance of the massive Central Valley and state water projects and the difficulties of managing the increasing and conflicting demands placed on water flowing through the region. The court also recognized that it is not the reviewing court's role to resolve the difficult and fundamental policy questions about allocation of these water resources and that the court has a limited review on scientific issues within the expertise of the consulting agency. All of these considerations are, again, relevant and important guidelines to impose here, especially given the daunting task of preparing the consultation for salmon and species. Mr. Durgie, can I interrupt? I have a pretty basic question. What triggered the consultation? In one of the other cases that I think we heard in Bank a year or two ago, it was the expiration of some of the water contracts that triggered the assessment and so on. What triggered the need for consultation here? There were two things that triggered it. First, there were some new listings of salmonid species and therefore the agency, the action agency and the consulting agency, which is the National Marine Fisheries Service, began a consultation in 2004. Simultaneously, or sort of in the same time period, the 2004, the existing biological opinion, was challenged by environmental plaintiffs, went before the same district court judge, and he found it invalid and set it aside and remanded it. So it was the combination of both, but it was actually already being prepared because of the listings of the species. Taking your argument point that delta smelt controls some of the issues here, one of the factual questions I had, and I'm not sure I can resolve it from looking at the record, is this is the same district judge who heard evidence from multiple experts and multiple declarations. How can I be assured that the district court put that evidence out of his mind when he said here, I don't need 706 expert witnesses, but he did admit some 20 declarations ostensibly under the two exceptions that we recognized in lands council, basically explaining technical terms and making sure that the agency assessed all of the factors it was supposed to assess? So what assurances can I find in the record that he wasn't unduly influenced by what he knew from the delta salmon case? I believe he was unduly influenced by what he heard there, and one of the fundamental errors here was in the way that the district court conducted its review. The delta smelt decision held that the district court overstepped its bounds by basically making the district court proceeding into an open record forum for debating the merits of the biological opinion. The delta smelt decision accurately observes that the appearance of an open record was a reality, and in effect, the district court conducted a proceeding as though it were a post hoc notice and comment type proceeding, with the district court assuming the role of judging the competing biological opinions against the comments it was receiving. In our view, delta smelt is dispositive on this issue, because the same thing happened in this case. Well, I guess what was not clear to me was we had not yet issued our opinion in delta smelt, so why did the district court not do in this case what he did there, which was to appoint the same experts to advise him on the scientific and technical issues here? Well, I won't get into the, I won't speculate exactly about his motivations, but I will say this. First of all, there's even more expert declarations in this case than in delta smelt. And the, in the supplemental briefing, the plaintiffs have tried to distinguish delta smelt, because there were seven or six experts in that case, and there are not here. And I have many reasons why that is not a distinction, but let me just pick out my best three, and I can continue on if they don't convince you. First of all, the delta smelt decision stated that the ASARCO case was directly on point. It is also on point here, and that was a case where there were no indication of seven or six experts. Furthermore, the exceptions to record review cases, all of those that say they are to be narrowly construed, none of those involve seven or six experts. Indeed, it is the very unusual case of an APA review case that there are court-appointed experts and if that were reason enough to simply open up the record to make it, you know, a completely open proceeding, then there would be no record review rule left. What's the practical distinction between the court appointing its own expert under 706 and the court relying on competing declarations by experts endorsed by the respective parties if the evidence is being introduced under one of the four exceptions that we articulated in Land's counsel? First of all, the rule 706 expert rule, it's providing a mechanism to have a nonpartisan independent expert to help the court. It also has safeguards for the parties that are not present when you have this kind of, you know, hired expert declaration. And I would say that rule 706 would never contemplate what happened here, which is thousands and thousands of pages of back and forth. And I guess, you know, again, to add to my points, these declarations do not fall within the narrow exceptions to record review. They are replete with new analyses, opinions, pulling out, you know, it's a debate about the interpretation of the studies and the data that exists. This is not, you know, sort of background explanation. Okay. But I assume you would not quarrel with my hypothetical that there might be a case where it would be permissible to rely upon the adversary process in educating the district court on the science by asking each of the respective sides to proffer their experts' discussion of the science. I would say there might be a case like that, but that is not this case. Counsel, just to follow up on that. So you're ceding the point that the adversary process can be used by the court to inform the court of the background of the case? I think that, well, not the, the narrow exceptions include explanation of technical terms. And so that, I'm talking about the narrow exceptions, but I see no occasion why there would be this back and forth, you know, sort of adversary, you said this, I disagree with that, you pulled out the wrong sentence from the study, you know, I rely on this sentence and so on and so forth. I don't see So what is your position on that question that Judge Tallman asked you? Is there ever an occasion when the adversary process would be helpful to the judge in terms of developing the background scientific development of the case? I don't think, you know, it's the word adversarial that I take issue with. And that's the point. Right. Are you saying that there can never be an occasion when the adversary process can be used by the judge to assist the judge in understanding the scientific processes? I think that it should never be the way it was here, which is a debate. There are cases, you know, I cannot deny that there are cases out there where district courts have allowed in a declaration and this Court has held it was not an abuse of discretion. But ordinarily we're talking about one or two. I mean, Lance counsel goes pretty far. I was actually surprised at how much our panel there relied upon the expert opinions that were offered by, for example, the environmental parties in that case in order to convince the panel that the science that the Forest Service had applied was deficient. It looked to me like that was kind of a classic example of the use of the adversary process in enlightening the Court as to the flaws in the agency's decision-making, which led our panel to conclude that it was arbitrary and capricious. Right. Let me just be clear. The government's position is consistently that there should only be record review and review is limited to the record. But I So you don't like Lance counsel? I mean, is that what you're saying? I mean, as you know, we're bound by that decision. Right. But if your position is it was wrongly decided, I'd like to know that. I mean, at some point, you know, we've gone in bank on this case once before. I can't predict what's going to happen down the road. But we're very aware of how important these issues are to millions of Californians and to the species. So if we've got a problem in our legal analysis, this is the time and the place to tell me what that problem is. I think I'm not suggesting we need to go on a walk and we need to revisit Lance counsel. I mean, clearly the government's bound by the decisions of this Court. I'm just saying that there is rarely any occasion and any need to go outside of the record review, that the case law is clear, that the occasions when that can happen are extremely narrow, and it was exceedingly exceeded in this case. Do you see any tension between Lance counsel and the most recent St. Louis case versus Jewell? I do not. What I see is that Lance counsel primarily stands for the proposition that it's not the Court's role to assume, to act as a referee of scientific journals. It's not the Court's role to not defer to the agencies. And that's, to me, the important teaching of Lance counsel that Delta Smelt is entirely consistent with. I just want to mention one more thing about the 706 issues. I'm going to defer to Ms. Poole because I know she's prepared to talk about this. But in the Delta Smelt decision, the presence of 706 experts was one of only six or seven factors that led this Court to conclude that the district court had overstepped its bounds. So I think it's a relatively minor rationale for distinguishing it and that the other rationales are. I don't know about that. I don't know that it was minor. I was on that panel. And I'm not sure I agree with you that that was a minor point. Well, then, I certainly can't say that I know better than you on that point. But I guess what I was looking at, and I think is the important part about that, is that it became an open record here, and there was no occasion to do that. And I think it also answers the question, if the Court thought it needed some, you know, outside expert advice on some of the technicalities, it knew what to do. And, in fact, it asked the parties to nominate 706 experts here, and they did, and the parties did, and the Court just, without any explanation at all denied it, said, I'm not going to appoint them. Was that before or after the 20 declarations had been filed on the cross motions for summary judgment? I'm not sure I can tell you the exact sequencing. I do know that it was after there had been a preliminary injunction proceeding with live testimony that went on for multiple days. There had been many declarations that had also been submitted, and that proceeding in the district court had made, you know, scores of pages of factual findings from that sort of de novo review. And then it relied on its own factual findings in the merits decision. It quotes itself from those. I mean, getting back to the question I asked you first, part of the problem for me is in recognizing that we review for abuse of discretion the district court's determination as to what evidence may properly be admitted under lands counsel, but we're dealing with a judge, as we are with I think all the parties here, who have lived with this litigation now for years, maybe a decade or more, and there is a history behind this litigation that Judge Wanger couldn't be human if he is he's not making this decision in a vacuum. He's making a decision based on what he knows from years of handling these cases. And how, as a reviewing court, we can parse through this record to determine whether or not he abused that discretion is a difficult task. Well, I would suggest the Court does not need to parse through the record and do that. I think that the correct approach would be what the Court did in the SARCO or in Delta Small, which is to just proceed to review the record without all these declarations. I mean, I will still ---- Do you review the record or remand it to the agency for further proceedings after pointing out the deficiencies? Do you mean to ---- I assume you mean to remand it to the district court. Well, and then ultimately back to the agency, I think. Well, I guess I take strong umbrage that there are any deficiencies here. I understand that, but just so we're not arguing hypotheticals, I mean, there are challenges here, for example, to whether the raw fish salvage data could appropriately be relied upon in order to extrapolate the population of the various fish species. I mean, to me, that's sort of a classic scientific debate over what is the best available scientific evidence to inform the discussion. And apparently, you know, fish are not very cooperative when we're trying to do a population census count. So at what point do we defer to the technical expertise of the agency and say, well, if raw salvage data is the best you've got, then that's the basis for your decision, and we have to defer to that. Well, I'd like to address the raw salvage data, but I guess going back to should the court go through and review this for an abuse of discretion, I would like to point out that besides the fact that courts frequently do not go through a line-by-line analysis, it is extremely difficult to do in this case because Judge Wanger made seriatim rulings on the declarations and on different lines of declarations, and he would defer them, and he would come back. And I could not piece together what's in or what is out, but I am mystified why the other side continues to use as an example of his parsing the Dr. DeRiso declaration because he said that certain paragraphs were excluded, but that he turned around and cited to them in the decision. And I think that's an example of how sort of confused this became. Let me talk about the negative flow and the raw salvage issue because there are many similarities on this issue and the Delta smelt. And I'm not saying that the particular studies that the agency relied on are exactly the same, but all the same framework that led this court in Delta smelt to say, you know, this is, it might have been better if they'd done this, but this is, they did not rely exclusively on the raw salvage, you know, figures, 65 and 66. Indeed, if you look at the party's position in this case, the Department of Water Resources argues that the agency relied solely on particle tracking modeling, and the expert, I mean, the export plaintiffs make the argument that it relied solely on these figures. And, in fact, the reality is that the agency relied on all multiple analyses, including those two, and also studies that involved salmon. So the same thing is present here as there, which is that there were multiple analyses and their pinning everything on these figures is simply not a realistic look at the record. You've used up all but about six minutes of time. Should we give Ms. Poole a chance? Yes, thank you. All right. Okay. May it please the Court? My name is Kate Poole. I'm here today on behalf of nine defendant intervenors representing conservation and fishing groups and the Winnemem Wintu tribe, all of whom have deep interests in and ties to the health of the salmon and other fish populations at issue here. Our fishermen clients, in particular, have made great sacrifices to try to protect and restore the salmon populations of California, including suffering the complete shutdown for the first time in history. Ms. Poole, you're burning up a lot of time on things that I think the panel is very aware of. Okay. I just want to make sure that the panel is aware that there are strong interests on both sides of the line. You have our hearts. Now win our minds. All right. Thank you very much. Let me just jump directly to the extra record evidence issue. And I think Jewell is very, the Jewell decision in the smelt case is very instructive there and should be followed by this Court. While there was the distinction that the district court chose not to apply or not to appoint 706 experts in that case, otherwise the cases and the approach that the district court took to evidentiary issues was remarkably similar. And I'd like to just direct the panel to the discussion in Jewell where the court cited at least five additional problems stating that admitting, that the district court's admitting so many extra record declarations first created a predictable battle of the experts. Second, gave the appearance that the proceedings were a forum for debating the merits of the by-act. Third, allowed post-decision information to be advanced as a new rationalization for attacking the agency's decision. Fourth, robbed the agency of its discretion to rely on the reasonable opinions of its own experts. And fifth, led the district court to substitute its judgment for that of the agency. All of those problems are just as prevalent, if not more so, in this case. And I'd like to just use the example of the Ross salvage question, which comes up in the context of Action 4.2.3 in the reasonable and prudent alternative. There the court completely followed or failed to follow the progression for the record review rule, which says, first, you presume that the record is adequate and only look outside of the record where the proponents of extra record evidence have made a case that the record is inadequate in some fashion and have carried their burden to show that it meets one of the four narrow exceptions to extra record evidence or to, excuse me, to the administrative record. And the court failed to do that here. And I think if it had done so in the context of that particular action, it would have recognized that that action was designed to protect individual fish from being entrained into the area where it suffers adverse impacts from the pumps and also in the interior delta, which is hostile to these fish. It wasn't designed to protect a certain percentage of the population, which is where the court got wrapped up in trying to fit this action into a hole that it was never designed to address. The district court's discussion of that action, I think, is also highly instructive because it's clearly set up as a he said, she said battle of the experts between NIMS experts and the outside experts, and the court even recognized at one point that the agency wins in that sort of battle of the experts, but still relied on plaintiff's expert Burnham to require additional explanation about why this action was required and explained that Mr. Stewart's explanation did not satisfactorily counter Dr. Burnham's post-decisional critique. So I'd like to briefly address the dual court's analysis of the non-Jeopardy factors under the regulatory definition of an RPA, if I might. The plaintiffs argue that the dual court's holding that neither the Endangered Species Act nor the APA obligates the consulting agency to address those non-Jeopardy factors doesn't resolve the issue here because while they sued the Fish and Wildlife Service for not addressing those factors, they're faulting NIMS for addressing those factors and condemn the agency because it, quote, actually undertook an explicit written analysis of whether its RPA satisfied the non-Jeopardy elements of section 402.02. And I think that argument's indicative of the approach that the plaintiffs and to a large extent the district court took in this case, which is that the agency was at fault no matter what it did. And it really tries to set an impossible threshold that would paralyze the agency, which may be plaintiffs' intent but is clearly not Congress' intent in directing the agency to take action to protect these species that are on the brink. Here, even if that's not the end of the story, NIMS addressed each of the non-Jeopardy factors more extensively than the Fish and Wildlife Service did in the smelt case. And the Juul court held in the alternative there the Fish and Wildlife Service's analysis was adequate. So I think it's clear here that NIMS went above and beyond what was considered adequate there. I'll reserve the remainder of my time. You've used it all up, and I'll give you some time on rebuttal. Thank you very much. All right. Thank you, Ms. Wolff. All right. Now, Mr. Sloan, am I right? Yes. Okay. Good afternoon, Your Honors. May it please the Court, my name is William Sloan. I am counsel for the Metropolitan Water District of Southern California. Presenting with me this afternoon is Mr. Clifford Lee, the Deputy Attorney General for the State of California, and also Mr. David Bernhardt, who is counsel for the federal contractor parties. We have divided the issues. I will be addressing the standard of review as applied to this case, the district court's proper admission of extra record evidence, and how the agency violated the Endangered Species Act Best Available Science Mandate. Mr. Lee will address the application of the standard of review to two specific components of the reasonable and prudent alternative, that's the inflow and export ratio and the OMR flow limits, and Mr. Bernhardt will address the issues on cross-appeal. We began by hearing quite a bit of discussion about the Smelt decision. I think it's important to observe that the Smelt decision could not and did not overturn the Supreme Court and this Court's precedent for the APA standard of review of agency decisions, namely that the agency must provide a rational connection between the facts found and the choices made by the agency. Second, the Smelt decision could not and it did not change the exceptions for the admission of extra record evidence. As this Court was discussing earlier, the Lands Council case and many other cases have all established the longstanding precedent that such evidence may be considered for the explanation of complex and technical terms. Third and finally, the Smelt decision could not and it did not change the longstanding rule that a court may not rely on post hoc rationalizations that are not stated by the agency. As this Court said in the Pacific Coast Federation case, the reviewing court must rely only on what the agency actually said in the biop to determine whether the agency considered the appropriate factors. So, Counsel, what is your point in terms of your statements regarding what the Delta Smelt case did and could not rule? What is your point in making those observations? Because the case did not purport to do any of those things that you mentioned. So what's your point? The reason for addressing that is because the longstanding principles that still exist even after the Smelt decision are now the task for this reviewing court to apply that standard of review to ultimately determine whether the district court abused its discretion in the admission of extra record evidence and to determine whether or not the agency provided a rational connection between the facts found and the choices made. But you don't dispute, do you, that the Delta Smelt case informs our decision in view of the fact that it was looking at the same opinion? It certainly informs your decision with respect to the law. However, it should not inform your decision with respect to the facts and the review of the administrative record. It is a different biological opinion. It's a different reasonable and prudent alternative. It is managing different species. But there's a substantial amount of overlap, is there not? We're only talking about the same river systems and the same water projects. I realize that there are differences in terms of the survivability of different species. Some are more hardy than others. But when you're talking about limiting water flows and the amount of water that can be exported, I mean, you're theoretically benefiting all of the species, are you not? Not just singular species. With respect to this biological opinion, the agency was specifically addressing the species here. I understand that. I'll use it as if there were one unitary water project, recognizing that there are at least two and maybe more. I mean, we basically have one water system that we're operating here that has a finite amount of water, and we have a number of species that are either listed as threatened or endangered, and then we have all these users who need access to the water. I don't understand how we can look at this case in a vacuum, if that's what you're arguing that we should do. Absolutely not. There's no question that this is a highly regulated project. It's a highly regulated environment. And what that ultimately leads us to is that it is incredibly complicated. And as a matter of fact, with this biological opinion, the reasonable and prudent alternative, as quoted in the federal appellant's brief, has 72 components. And many of those components, including the one we heard about, the raw salvage, are specifically tailored to individual species. The negative 5,000 limit that we're talking about here is not a negative 5,000 limit for the delta smelt. It was a specific analysis conducted for the salmon. But it's a different analysis but based on the same science. I would respectfully disagree with that position. What's different about the science that was used in this case that was not used in the delta smelt case? Because didn't they do an analysis of the cubic feet per second in terms of how the water should flow and at what point does the water flow sufficiently to be of a positive value to the species as opposed to being detrimental? Wasn't that same approach used? A similar approach but using a different species and different entrainment. But they're swimming in the same water. They're being sucked into the same pumps. You're losing me on the point you're trying to make here in terms of trying to distinguish delta smelt from this case. With respect to this case, the agency conducted an analysis specific to salmon. Well, salmon and orcas and Central Valley steelhead and spring and winter run chinook, they're all swimming in the same stream, counsel. Yes, they are. So how can you expect the operators of the water project to comply with just one biological opinion? They have to operate the system so that they adhere to all of them. If you're arguing that they're totally isolated and unrelated, you've lost me because I don't understand how you can do that. Maybe I can explain it in the context of the raw salvage limit. We heard about action 4.2.3. That is a limit that's established in the salmon biological opinion for six months out of the year. It is a calendar-based limit, and it was developed precisely on entrainment graphs that only were looking at entrainment of salmon. Six months out of the year, the projects are restrained to negative 5,000 CFS solely for the purpose of what purports to be avoiding jeopardy to the salmon. That is not the same time period as the smelt RPA. And so what we have actually is a situation of overlapping regulation that actually restrains the projects even further, and I would submit making it all the more important that we insist upon the agency adhering to the mandates under the law. In this case, the best available science mandate requires that they use the available population data. They didn't use the population data that they had available to them in setting that limit. Mr. Sloan, what do we do with the, I lost count, but four or five, six times that the district court cited to his prior district court smelt decision in making findings in the salmonid decision? Isn't that extra record? And you say there are two different cases, but the district court itself cited to his prior. Yeah. I'd like to clarify on that issue. With respect to the extra record evidence, we do not believe that the district court abused his discretion, that it was entirely appropriate to consider extra record evidence. But you say there are two different cases, yet the district court used the smelt decision and the facts underlying it to support his decision in this case. I would need to look at the specific examples that perhaps Your Honor has in mind, but he definitely did an independent analysis, and I can cite even to the instances in the record in this case where he went through the individual declarations. He did not accept testimony that he concluded was a battle of the experts. For example, I can cite to the excerpts of record 392 where the judge said, if it's a horse race and it's a matter of our opinion is better than yours, the law very clearly says what the result must be, and that is that the agency wins that contest. But then what would be the point of having those declarations if the court's approach was to defer to the agency? It is to defer to the agency. What he first has to do is he has to understand and educate himself on the complex and technical subject matter. We heard from the appellants that on the one hand this is so complex and technical we defer to the agency. On the other hand, it's not complex and technical enough that we should consider extra record evidence to understand that. Well, but the court has an avenue to do that and decided not to appoint a 706 expert in this case. That's right. He did not. All the more reason that the other declaration should be considered so that. So in response to the same question that I asked Ms. Durkee, you would agree that the court may rely on the adversary system and look at competing expert declarations in order to educate itself. Yes. And better understand the record. That is, I believe that is the law. And that is, frankly, the only way in cases such as this that are as complicated as they are that the court can ultimately perform its reviewing job, which is. So why didn't the district court appoint a neutral 706 expert to give an impartial primer to the court on the science? As Your Honor observed, he's lived with these cases for a long time. Maybe he didn't feel that was necessary. Ultimately, it's just a determination whether he abused his discretion. But am I correct that you urged him to do that, to appoint 706 experts? We did submit in the Salmon case 706 experts. And if I recall correctly, we did request them in the Salmon case. And he held a two-day hearing on what experts he should rely on, did he not? He did. And he parsed through all of the material that's submitted. And he only accepted explanatory material. He would not accept anything that he viewed as a battle of the experts. I know I'm running over my time. I'm very mindful of my colleagues. If you want to yield to the next is Mr. Lee. Thank you. May it please the Court, my name is Clifford Lee. I am a Deputy Attorney General and I'm counsel here today on behalf of the California Department of Water Resources. At issue in this appeal are the operating criteria for the Central Valley Project and the State Water Project, which are projects that deliver water to over 20 million agricultural and urban water users. The legal principle raised is whether the National Marine Fisheries Service's actions under the ESA are arbitrary and capricious within the meaning of the APA. The district court below agreed. The Department of Water Resources today urges this Court to affirm. Arbitrary and capricious is a pretty high standard. Wouldn't you agree? But it contains within it the seeds of the analysis. There are two parts to that analysis. Does the evidence in the record support the findings and are the findings rationally connected to the ESA choices made? It's that latter component, the component set forth in the State Farm decision, that we are focused here today. We submit that the district court correctly applied the State Farm standard in addressing the Department of Water Resources and also the Stanislaus River claims at issue in this appeal and that the service's biological opinion has not conducted the evidentiary dots. Counsel, could I? Did you say that the district court properly applied the State Farm decision? The State Farm. Oh, State Farm. State Farm mutual versus the case. I'm sorry. State Farm. Okay. All right. This evidence, this fact is demonstrated by the district court's conclusion on the rulings and the biological opinion's actions 4.2.1, the IE ratio, and 4.2.3, the inflow-export ratio, measures that would significantly reduce water supplies available to the people of California. So, counsel, would you tell me specifically for those two parts of the opinion why it was not rational, why they were not rationally related to the evidence? Absolutely. Let's start with 4.2.1. First of all, the inflow-export ratio is a ratio of the inflow of the San Joaquin River measured at Bernalas at a location, that's a location on the San Joaquin River, over the amount of water the projects export from the Delta. That's the fraction. The maintenance of this ratio arithmetically limits project exports. The district court's measured ruling sustained the service's use of the inflow-export ratio in most water years, but invalidated the specific 4.2.1 ratio, the ratio that only applies in the above-normal and wet years. Would you tell me why that was not a reasonable outcome from looking at the information in the record? Yes, Your Honor. I can actually cite to the United States Republic where on page 26 they say, quote, there is no conclusive study of fishery benefits for ratios greater than 2 to 1. I would further cite to the 2005 Department of Fish and Game study, which can be found on the excerpts of record at 2588, which was amazingly relied on by the United States, but refutes the idea of a 4 to 1 ratio. But, counsel, may I ask you, the fact that there is no conclusive study does not prevent the decision of the agency from being reasonable, does it? When you have numeric objectives, this Court has made it quite clear that the agency, in this case the National Marine Fishery Service, has to provide a quantitative analysis to justify those numeric consequences. I would refer this Court to a ---- But doesn't your position require the agency to commission studies that have not yet been ---- No, not commission studies, but to provide some kind of quantitative analysis. It could be based on existing studies, but quantitative justification. But to tee off of what Judge Rolison just asked you, if the existing state of the studies are inconclusive, then how can we declare arbitrary and capricious a determination by the agency that the ratio should be 4 to 1? Well, this Court did precisely that in the Pacific Coast Federation of Fishermen case, where, in fact, in the Pacific Coast Federation of Fishermen case, there was a three-stage salmon protection program for the Klamath River fisheries. No one disputed when National Marine Fishery Service got to Phase 3 that the species would be fully protected. However, this Court overturned the biological opinion because the service had failed to comply with Phase 1 and 2. Mr. Lee, where are we today? I mean, we are in the midst of a hundred-year drought. That's correct. So what's the current ratio, 1 to 1? I believe because we have a serious drought, it's a 1 to 1 ratio. Yes. And are there any studies being done to make a determination as to what the impact is on these various species? There are ongoing studies, yes, Your Honor, looking at the impact of a 1 to 1 ratio. In fact, the Biop itself mandated a long-term research program. There has been a continuing research program called the Bernalis Adaptive Management Program. They have a very fancy, to my mind, scientific program where they release tagged salmon down the San Joaquin River. They measure when exports are high and when exports are low, and they determine whether the survival of those salmon are affected by the changes in ratio. That is an ongoing study that is occurring as we speak. So, yes, we are engaging in further studies. So your position is that we should affirm the district court. What would be the effect of affirming the district court, which would then require the agency to go back and, I guess in some respects, start all over again, or at least do a better job of citing to better science to support the ratios that were chosen? With regard to Judge Wenger's ruling, affirming the district court would only require a modest review of the Biop. You say modest review, but every time we send one of these things back, it takes years before we see the thing again. In the meantime, the climate does what the climate does, and neither we have wetter years or, sadly now, drier years, and the problem gets worse rather than better. Be careful what you ask for. I'm not sure that the relief that you're asking us for is going to help anybody, including the species and the fishermen and the farmers and the people who are depending on this water to drink. There is plainly a crisis situation. We have a situation today for the south of the Delta farmers from the Central Valley Project. They're getting zero allocations, and for the State Water Project, only 5% of their allocation. Definitely serious. More the reason that the law in this area be settled and clear and the obligations of But I'm not sure it's a practical problem. A court will ever be. I mean, you're asking us for a Solomon-like solution. We sent you to mediation. That didn't go anywhere. And now you're back again with yet another lawsuit. And I'm really wondering what it is that you think that the court is going to be able to do that the scientists and the people who have to live with this system understand far better than judges. Well, let's take a look at it from the standpoint of a four-to-one ratio. Let us say we affirm the district court's ruling on the four-to-one ratio. The matter would be remanded back to the National Marine Fisheries Service. The National Marine Fisheries Service would make a determination based on best available science. Does the four-to-one, is the four-to-one ratio in wet and above normal years essential to avoid jeopardy or adverse modification to the listed salmonids on the San Joaquin River? That component can be done with science that is currently ongoing. This is not plowing new biological science. We have ongoing science that is looking at precisely this question. So what you really want is you want the record reopened. Well, the record should be, the matter should be remanded so the court, the service can make a determination based on its resources and the resources of those that provide comments, whether that is supported. It doesn't, I mean, what you just told me requires reopening the record. Well, it would require reopening the record of the biological opinion, and that would be a good thing, by the way. There has been new evidence since the 2008 biological opinion that would aid all parties in rendering a resolution of this issue. Counsel, may I ask you, what case in your mind supports the theory that the agency has to show that its recommendation is essential for protection of the species as opposed to reasonable? I think this Court should take a look at the Pacific Coast Federation of Fishermen. Does that contain the language saying that the agency must show that the recommended action is essential? It doesn't use the word essential, but it does address whether subcomponents of an RPA have to, in fact, provide protection for the species. Well, there's a big difference between saying that the action, proposed action, tends to provide protection, or is predicted to provide protection, and saying that it has to prove that it's essential to provide the protection. That's why I ask you that question, because I haven't seen any cases that say the agency has to show that the recommended action is essential. The Pacific Coast Federation case does not say that, but the Endangered Species Consultation Handbook that the U.S. Fish and Wildlife Service and the National It says it is imperative that the opinion contain a thorough explanation of how each component of the alternative is essential to avoid jeopardy or adverse modification. And that can be found on Volume 12 of the Excerpts of Record 3022. So is your argument that because the agency didn't comply with its handbook that we should negate the biological opinion? With regard to 4-1, the answer is the handbook is a reason, and I think the reasoning of the Pacific Coast Federation case where subcomponents of the RPA were not sufficiently shown to avoid jeopardy or adverse modification establishes the same principle. Okay. If there are 70 or more of them, why shouldn't this be a cumulative analysis as opposed to a divide-and-conquer approach? Because, first of all, the handbook itself, which the Jewell case, the Sipsmell case, gives Skidmore a level of deference. Power to persuade. Power to persuade. But here I'm looking at a 560-page biological opinion that includes, what, 72 reasonable and prudent alternatives in order to address all the issues that the agency is wrestling with, and you're telling me I'm going to invalidate that entire report on the basis of a paragraph out of the agency's handbook? Well, not just a paragraph, Your Honor. We say the Pacific Coast Federation Fisherman case stands for that proposition that subcomponents of an RPA have to avoid jeopardy and adverse modification. Each and every one of them, standing alone. That's your position? That has to be. They have to contribute to avoiding jeopardy. But that's different. That's what Judge Rawlinson was trying to pin you down on, and I agree with her. I mean, tends to improve or protect is different from essential to protect. Well, even if you don't follow the service's own handbook, and even if you use the word contribute instead of saying essential, there is no evidence in the record that the 4-to-1 ratio, in fact, contributes to the avoidance of jeopardy or adverse modification of the listed species. Okay. I think we understand your position. Okay. I know you've used up all your time, but I will allow Mr. Bernhardt to address this. Good afternoon, Your Honors. I'll be very, very brief. My name is David Bernhardt. I'm appearing here on behalf of the federal contractors who are public water agencies that contract for water from the Bureau of Reclamation. And I'll move very quickly through this. So first, the first issue I'd like to address is in regard to the baseline or the effects of the action issue. And we think the district court essentially missed a layup here. And before I jump into the argument, I do want to make a point about Section 7, that, you know, it's entitled interagency cooperation for a reason. And the point here, the point is not general fish recovery. What the point is, is what is the action that the agency is going to cause and whether or not that cause amounts to jeopardy. And in this case, we have a biological opinion where NIPS actually wrote down what it thought it must do under the ESA and its regulations and even this court's opinions. And then it headed down a road that was precisely that road. And they came to a point where they decided that their efforts down that road were, quote, not fruitful. And as a consequence, they changed course. And when doing so, they blew by their regulations. And what they did is they did not actually distinguish between the projected effects of the listed species that were caused by reclamation and those that were not caused by it. Instead, they simply assumed what effects were caused by reclamation and did so without any additional analysis. Now, the district court thought this approach was reasonable. And in a vacuum it might be. But the problem is, Your Honor, that the Secretary of the Interior had already decided to set up its own regulatory scheme and it didn't draw the line the court wanted. Now, the assumption without analysis approach is not supported by the ESA, the regs, or even this court's decisions. And what we have here in our opinion is simply a case just like National Wildlife Federation where NIFS is failing to do the work it's required to identify the effects that are actually caused by the agency. In National Wildlife Federation, they used a reference approach to improperly place effects within the environmental baseline. Here they simply assumed which side of the equation effects would fall on. And both approaches are equally flawed. Mr. Bernhardt, I'm not sure I understand your argument. Are you seriously contesting that entrainment of fish and salvage loss and low water flows have no impact on the continued existence of species that are already listed as threatened and in danger? Well, you know, the question before the agency, Your Honor, is not whether there is an impact here. The question is not only whether, but to what extent. And it's the only way you can identify to what extent is you have to figure out what is the world without the action and the world within it. And this is why the Secretary is right. It's difficult to do when you have species that are so small in number and which are very difficult to count. I completely agree, Your Honor. And that's why it's fascinating. The reason that the Secretary, I believe, wrote the regulation like he did so that you could determine what the effects were that were going to be added, I think he did that precisely, Your Honor, to ensure that you would know exactly what was going to impact this fish. Because remember, the requirement of the law is not this consultation. The requirement of the law at the end of the day is not only consultation but this reclamation must ensure that its actions will not lead to jeopardy or adverse modification. And the only way to do that, Your Honor, is to have clearly and appropriately identified what the effect is. Because in developing a reasonable and prudent alternative, Your Honor, what you're doing is you're figuring out if you have this much effect, what are the alternatives that will bring it back to just the point, just the point, Your Honor, of not causing jeopardy. The program is not designed to save the world's fish. Section 7 is simply designed to ensure that the action agency's effect on the fish will not lead to jeopardy or adverse modification. That's what Section 7 is. Counsel, are you challenging the first summary judgment ruling or the second summary judgment ruling? Well, we're challenging specifically, Your Honor, the ruling that our effects analysis, that we're specifically challenging the district court's decision that the effects analysis was our motion for summary judgment on the effects analysis from our results. So that's the second one, the baseline effects analysis, is that what you're challenging? Actually, we challenge both. We challenge the discretionary, and I believe Curtin County challenged the other one, Your Honor. Okay. So you're specifically challenging the ruling on the discretionary versus non-discretionary. That's right. We did, Your Honor. We did. I was just trying to make sure that I knew specifically. Obviously, the issues associated with 7A2 don't change, Your Honor. And the question with the effects analysis is simply this. The regulation requires, the regulation requires that the service account for the effects that will be added to the baseline, and to do that they need to be able to identify them. So in your mind, what do you identify as the discretionary effects? Well, you know, Your Honor, what we do know here is that this court has laid down a ruling to make that process work just fine, and that is their recent decision with NRDC. And what they say there is the question is, the question is, is there some discretion to take action for the benefit of this species? And to me that implies that for mandatory or things that look like mandatory obligations, the service needs to ask itself the following. First, is there discretion? And second, would it have any benefit to the species? For example, you may have a situation where you're ordered to pump as a matter of law. You can't, but you can decide whether to pump on Monday or Tuesday. But it may turn out that that Monday or Tuesday doesn't make any difference to the fish, that you're going to kill just as many fish on Monday as you are going to on Tuesday. So even though you have a discretion, the fact of the matter is, those consequences aren't the consequences of agency administrators. But in this particular case, on the facts of this case, what were the discretionary effects that you were telling the court were not segregated from the non-discretionary? What were the discretionary and what were the non-discretionary effects in this particular case, on the facts of this case, in your view? Well, Your Honor, the way the process actually works is, in most consultations, that would be a question that fish would ask reclamation. And in this case, reclamation provided an extensive amount of information. It doesn't look like NIPS looked at that. But if they could, maybe it helped them, maybe it didn't, or maybe they would have asked reclamation. But at the end of the day, it's the agency's job to identify that. That's not our job. Well, so is it your position that they were not only not analyzed, they were never identified? Is that your argument, that the discretionary versus non-discretionary effects were never identified by the agency? Well, what we show in our brief, Your Honor, is that there's a number of places where the NIPS actually said things like, the State Water Contract Board requirements impose that the Central Valley Project constrains. And they do clearly have those in there, but they didn't do any analysis at all, so we don't know, Your Honor. So the reason I'm asking you these questions is it's difficult for me to decide whether or not you have a legitimate argument if I don't know what the argument is in terms of what, I mean, you're telling us that there was a failure to distinguish between discretionary and non-discretionary actions, and I don't know that I understand exactly which lies in which category. And so it's difficult to even decide whether there was an abuse of discretion because there has been no delineation of what you're talking about. Well, that's a great point, Your Honor, and the reality is we don't know. We know that Reclamation had pages and pages in Appendix I of the biological opinion of the obligations on the project, and they used words like imposed, constrained, requires. And you know what they did, Your Honor? There's absolutely no analysis of whether they looked at those and made the call that you're suggesting that they might make. But they didn't do it. This record doesn't allow us to do that. Well, the district court was of the view that there was no requirement to do that.  Well, I think, Your Honor, I think, Your Honor, the NRDC decision makes that requirement quite clear, and it says is there discretion to take action for the benefit of the species. And that is what this agency needs to do, is look at those requirements and make that call. Now, generally, they would make that call with Reclamation, but in this instance, for whatever reason, they decided to assume, and the discussions had not been fruitful, and they went forward and plowed ahead. All right. Thank you. Thank you for your time. All right. I will give Ms. Durkee and Ms. Poole three minutes each in reply. And hopefully one of you will address this discretionary versus non-discretionary issue. Okay. In light of time, I just want to make one point. But before I do, my single point about the discretionary and non-discretionary argument by the federal contractors is that it's exactly the same as the argument they made in Delta Smeltz. They used the same examples of non-discretionary operations, and they did not prevail, and I think it is clearly dispositive on that issue. The point that I want to make is the issue about what the nub of this issue is the fact that the science is not conclusive. And what the plaintiffs, and particularly Mr. Lee, said was that there is the claim that the ratio, for example, has no support because there is no conclusive study showing four to one is beneficial. If that were enough, that would turn the Endangered Species Act on its head. The best available science data is there to force the agency to make decisions, even though there are not perfectly tailored studies that answer all the questions. And the way that they use the word essential is not sort of the simple, oh, provide an explanation. No, they're using that as a substantive criteria that says you cannot take action to protect a species until you get that conclusive science. And not only that, we're going to block you from operating the system to ever know what would happen if you had a four to one ratio. And, you know, that's not the law. It cannot be the law if the Endangered Species Act is to have any impact whatsoever. Congress put its thumb on the side of protecting species, and the action agency must ensure that it does not jeopardize. And the final sort of examples, if they keep relying on the Pacific fishermen's case, that was a case where the court held there was not enough protection for the species, that there was not enough showing that it would actually be enough to prevent jeopardy. They have the opposite argument here. They're saying until you have conclusive evidence to prove this will do exactly, you know, the benefit, you can't do it. You cannot protect the species. And the number of replications it would take and the noise and the different environmental variabilities to tease all of that could be decades. The species is not required to wait. Thank you, Mr. Earp. Ms. Poole. Thank you, Your Honor. Let me begin by addressing Mr. Bernhardt's argument. The cases that Westlands and San Luis and Kern are relying on, from homebuilders down to the recent NRDC en banc decision of this Court, are talking about the question of whether the Section 7 obligation is triggered in the first place. That's where the discretionary versus nondiscretionary distinction is important. And the regulation that is interpreted in those cases goes to that question. They don't address the question which plaintiffs are raising here, which is once you're in a Section 7 situation, which clearly we are here. Nobody is disputing that Section 7 was properly triggered. Do you then, does the consulting agency then have to segregate discretionary from nondiscretionary obligations? And I would offer that the NWF v. NMFS set of cases that this Court has decided are more on point to that analysis. And those cases held that NMFS is not required to parse out a set of only discretionary operations and demonstrate the harms caused by those operations alone jeopardize the species. In fact, the Ninth Circuit rejected it when NMFS tried to do that. Unless you have other questions, I'll sit down. Ms. Poole, I have one. One of the briefs talks about a distinguishment between the effects of the action and the environmental baseline as a predicate to the challenge of discretionary versus nondiscretionary. What do you say to that about this environmental baseline? I think that goes, again, to that NWF v. NMFS discussion. I think that that case really addresses that much more so than the homebuilders series of cases, which are looking at another question. And what NWF v. NMFS held is that even if you're already in a jeopardizing situation, because the environmental baseline is jeopardizing these species, you can't take further action that will deepen that jeopardy. And that may be the situation that we're in here. So you don't have to parse it out. You just have to avoid taking action that deepens the jeopardy of the species. All right. Thank you. All right. I want to thank all counsel for a case ably argued. I think it will be helpful to the court as we try to make our way through. We will get you a decision as soon as we can. But don't stand by your phones too soon. We will be adjourned for the day.
judges: Rice, TALLMAN, RAWLINSON